IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA      :
                              :
              v.              :   CRIMINAL ACTION NO.
                              :   1:12-CR-183-JEC-JSA
HERBERT CLIFTON HECTOR        :
                              :

## REPORT AND RECOMMENDATION

Defendant Herbert Hector and his Co-Defendant are charged with bank robbery, in violation of Title 18, United States Code, Sections 2113(a) and (d), relating to the robbery of a Wells Fargo Bank branch in Duluth, Georgia on May 15, 2012.

This action is now before the Court on Defendant Hector's Motion to Suppress Statements, filed on July 10, 2012 ("Motion") [28]. The Motion as originally filed alleged that law enforcement officers extracted involuntarily-made post-arrest statements from the Defendant, and that the officers violated *Miranda v. Arizona*, 384 U.S. 436 (1966) [28]. The Court held an evidentiary hearing on the Motion on September 26, 2012 [39]. Based on the testimony, on September 28, 2012, Defendant supplemented his Motion to argue that his post-arrest statements should be suppressed for the additional reason that the agents violated the Defendant's right to prompt

presentment in court, in violation of the so-called *McNabb-Mallory*[1] rule, as embodied in Title 18, U.S.C., § 3501(c). Supplemental Motion [40]. In other words, Defendant argued that his statements were extracted following an unnecessary and unreasonable delay after his arrest but before his presentment before a U.S. Magistrate Judge pursuant to Rule 5, Fed.R.Crim.P. *Id.* At the request of Government counsel, the Court convened a supplemental evidentiary hearing on October 30, 2012 to permit an opportunity to present evidence relating to the prompt presentment issue [44].

The transcript of the September 26 evidentiary hearing was filed on October 10, 2012 [45] ("Tr. I"), and the transcript of the October 30 evidentiary hearing was filed on November 8, 2012 [47] ("Tr. II"). Defendant filed his Post-Hearing Brief on December 18, 2012 [54], and the Government filed its Response on January 9, 2013 [55]. Defendant was permitted until January 14, 2013 to file a reply but he did not do so [51]. Thus, the Court deems this matter as being submitted to the undersigned on January 15, 2013.

As explained in more detail below, the Court **RECOMMENDS** denial of Defendant's Motion to Suppress Statements [28] and the Supplemental Motion to

---

[1] *See Mallory v. United States*, 354 U.S. 449 (1957) and *McNabb v. United States*, 318 U.S. 332 (1943).

Suppress [40]. The statements were made voluntarily and in compliance with *Miranda*. The prompt presentment issue is a closer call. There may have been some unnecessary and unreasonable delay in Defendant's presentment to a U.S. Magistrate Judge on the afternoon of May 16, 2012. But the statements at issue did not occur during or as a result of such delay. Moreover, the Government has pointed to controlling law in this Circuit providing that a valid *Miranda* waiver also waives violations of the prompt presentment rule. *See O'Neal v. United States*, 411 F.2d 131, 136-137 (5th Cir. 1969)[2]. Thus, because the statements were not made during or as a result of the unreasonable delay in presentment, and because any violation was vitiated by Defendant's *Miranda* waivers, the Motions should be denied.[3]

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[3] Defendant also filed a Motion to Suppress Evidence, relating to an alleged unwarranted collection of DNA evidence from the Defendant. [29]. Government counsel indicated at the pre-trial conference, and again at the September 26, 2012 suppression hearing, that the Government would not seek to introduce or otherwise use this evidence at trial [39]. Based on that representation, the Court **RECOMMENDS** denying Defendant's Motion to Suppress Evidence [29] as moot.

## FACTS

At approximately 11:45 a.m. on May 15, 2012, Special Agents with the Federal Bureau of Investigation ("FBI") responded to a car crash in Gwinnett County, Georgia. Tr. I [45] at 5; Tr. II [47] at 5. The FBI responded because the crashed vehicle was reportedly used by suspects who robbed a nearby Wells Fargo Bank branch earlier that morning. *Id.* The agents stayed with the vehicle for up to one hour, inspecting the car's exterior and what was visible of the interior through the windows, and otherwise securing the vehicle. Tr. II [47] at 6-7.

Shortly thereafter, the agents learned that nearby local law enforcement officers had arrested two suspects. Tr. II [47] at 7. The agents traveled to the arrest location, which was also in Gwinnett County, Georgia, and arrived shortly before 1:00 p.m. *Id.* They found the Defendant and another suspect in the custody of local officers. *Id.* at 7-9. The agents spent between 15 and 30 minutes gathering information from the local officers as to how the suspects were arrested and what information led to the arrests. *Id.* at 8-9.

Shortly after arriving, an FBI agent advised the Defendant of his *Miranda* rights while he was detained in the back seat of a Gwinnett County patrol car. *Id.* at 9. The

Defendant declined to speak to the agents, and the agents therefore terminated the attempt to interview him. *Id.* at 9-10; Tr. I [45] at 7-11. The Defendant executed the advice of rights form at 1:03 p.m. Tr. I [45] at 7-11; Gov't Ex. 1. At approximately 1:30 p.m., the FBI took custody of Defendant. Tr. I [45] at 11. When asked about the approximately 30 minutes that elapsed between when the agents attempted to interview the Defendant and when they took him into custody, one of the agents explained:

> At the time he was in the back seat of a Gwinnett County patrol car. He was still in their custody, if you will. And we were just trying to sort out everything that was happening. We had four separate scenes that were going on. You had the bank robbery site, the vehicle crash site, and then two separate locations where the defendants had pled – excuse me, had fled, as well as numerous items of evidence.
>
> We were just trying to sort everything out as far as who we had, the probable cause that was necessary to take them into federal custody. Eventually the determination was made that we would in fact take them into federal custody and prosecute them federally. So once that decision was made is when we officially took them into custody, which would have been 1:30.

Tr. II [47] at 32. The agent added that the FBI had to "speak[] with [Gwinnett County] about the arrival of their evidence response unit to collect numerous items that were discarded in the woods that needed to be collected as evidence." *Id.* at 35. The agent also mentioned that the FBI "did in fact collect $200 that had been dropped

and turned over to the Gwinnett County Police Department." *Id.* According to another agent at the scene, he had already accepted this money from the local officers at "approximately" 12:57 p.m. Tr. I [45] at 14-15.

After taking the Defendant into FBI custody at around 1:30 p.m., the agents searched him and then transported him to the Atlanta Police Department ("APD"), where the FBI maintains its own secure booking facility. Tr. II [47] at 10-11, 26. He arrived at APD for booking at 2:05 p.m. *Id.* The FBI booking process takes approximately 45 minutes, and includes fingerprinting, obtaining a DNA sample, and obtaining answers to a series of basic identifying questions. *Id.* at 11-13. The booking process ended at approximately 2:50 p.m. on May 15. *Id.* at 13.

After booking, the agents brought the Defendant to the Atlanta City Detention Center to be housed overnight. *Id.* at 14-15. The agents did not bring the Defendant to the U.S. Courthouse in Atlanta for presentment that day before a Magistrate Judge, because it was after the 2:00 p.m. cut-off time for delivering new arrestees to the Courthouse. *Id.*

FBI policy provides: "Following an arrest the defendant should be brought to the nearest FBI office for fingerprinting, photographing, and an interview where

appropriate. Other law enforcement offices may be used for this purpose if FBI facilities are not reasonably available. This process generally should not exceed six hours, measured from the time of arrest to the time of arrival before the magistrate judge." Tr. II [47] at 13; Gov't Ex. 3, p. 3. The agents did not bring the Defendant to the U.S. Marshal's facility located at the U.S. Courthouse on May 15. *Id*. at 25-27. Rather, the agents determined that the FBI facility at APD was reasonably available even though there was no possibility of booking the Defendant at APD and also ensuring presentment that day before a Magistrate Judge. *Id.* According to the agent, "I don't have access to the Marshal's facility," "it's our standard process to book them ourselves, not to have somebody else book them," and "when the Marshals book it doesn't book as an FBI arrest. We use our facilities to book them and show that they were arrested by our agency." *Id.* at 26-27. The agents did not attempt to re-interview Defendant that evening. *Id.* at 15.

At approximately 9:30 a.m. on May 16, 2012, FBI agents picked up the Defendant to transport him to the U.S. Courthouse for his presentment before a U.S. Magistrate Judge. Tr. I [45] at 20; Tr. II [47] at 16. The agents advised the Defendant of the procedure that would occur that day and of the specific charges with which he would be presented in court. Tr. I [45] at 20-21, 35; Tr. II [47] at 16. Agents told

Defendant as they were driving that he would be charged with armed robbery and use of weapon in the commission of that robbery. Tr. I [45] at 21, 31; Tr. II [47] at 17. In apparent response to that information, Defendant stated that he did not have the gun during the robbery. *Id.*

The agents indicated that they would like to speak with the Defendant further about what he had just uttered, and the Defendant agreed to do so. Tr. I [45] at 21; Tr. II [47] at 17. According to the agents, "at this point we're in the vehicle" on the way to court for Defendant's presentment. Tr. I [45] at 21. After the Defendant indicated he was willing to speak, instead of continuing to drive to court, "we went around the corner to the Atlanta Police Department interview room that we [i.e., the FBI] have there." Tr. I [45] at 21. This was a short distance, and it took approximately 30 seconds to arrive at APD. Tr. II [47] at 17. The agents "hadn't even pulled out of the [Atlanta City Detention Center] garage yet" when they turned the car around to take Defendant to the interview room. Tr. II [47] at 17.

Once in the interview room, the agents removed the Defendant's handcuffs. Tr. I [45] at 23-24. The agents were casually dressed and did not have firearms with them in the interview room. *Id.* The agents read Defendant's *Miranda* rights to him again, and provided a copy of the FBI advice-of-rights form for Defendant to read along. *Id.*

8

at 21, 24-25. Defendant appeared to understand and follow along. *Id.* at 26. He did not ask any questions and, instead, at 9:45 a.m., initialed and signed the form indicating his understanding of and desire to waive his *Miranda* rights. *Id.* at 21, 24-27; Tr. II [47] at 18; Gov't Ex. 2. Defendant stated that he understood English, could read and write, had obtained a "GED" degree and also attended technical college for four years. Tr. I [45] at 25; Tr. II [47] at 19.

The Defendant was cooperative, calm and responsive during the interview. Tr. I [45] at 27; Tr. II [47] at 21. The agents attest that they did not threaten, assault or promise him anything in exchange for making a statement, Tr. I [45] at 28, and Defendant does not offer any contrary evidence. Defendant did not renew his invocation of any rights during this interview, which lasted 30-45 minutes. Tr. I [45] at 27-28; Tr. II [47] at 22.

After the interview, the agents brought Defendant to the U.S. Courthouse in Atlanta. Tr. I [45] at 28-29; Tr. II [47] at 23. The agents arrived with the Defendant at approximately 10:50 a.m. Tr. II [47] at 23. According to the minutes on the docket, the Defendant's initial appearance occurred approximately two hours later, at 1:41 p.m. [5], approximately 24 hours after arrest.

# ANALYSIS

## I. DEFENDANT MADE HIS MAY 16, 2012 STATEMENTS VOLUNTARILY AND AFTER HAVING EXPRESSLY WAIVED HIS *MIRANDA* RIGHTS

In *Jackson v. Denno*, 378 U.S. 368 (1964), the Supreme Court held that when a defendant objects to the introduction of a statement to law enforcement as involuntary, due process requires the trial court to make an independent determination that the statement was voluntary before it may be heard by the jury. A two-part inquiry determines the admissibility of a self-incriminating statement. First, the court must consider whether the Government complied with the requirements of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966). Second, the court must consider whether the statement was voluntary. *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir.1994).

The Defendant's initial Motion to Suppress statements [28] alleged that his statements were involuntary and obtained in violation of *Miranda*. Defendant's Post-Hearing Brief does not extensively argue these points, focusing instead on the alleged prompt presentment violation. Indeed, the Government argues that the Defendant

abandoned the due process and *Miranda* arguments by not pursuing them in the post-hearing brief.  Gov't Response [55] at 12-13.

But Defendant's brief at least briefly states that the agents "lured him into an unintelligent and involuntary waiver of his *Miranda* rights and into their interrogation room," and that the agents "used coercive tactics to overcome his documented resistance to submit to an interrogation."  Post-Hearing Brief [54] at 7-8.  Defendant also implies that the agents improperly re-initiated the interrogation during the car ride on May 16, after the Defendant invoked his right to remain silent on May 15. As Defendant argues, "the agent surely knew that telling Mr. Hector he was charged with using a firearm during a crime of violence would certainly cause him to spontaneously retort that he never used a firearm."  *Id.* at 8 n. 1.  Thus, the Court will treat these issues as preserved.

Based on the totality of the facts presented, however, the Court concludes both that the agents complied with *Miranda*, and that the Defendant voluntarily, knowingly and intelligently waived his *Miranda* rights and made statements to the Government.

**A.** ***The Agents Complied With* Miranda**

In *Miranda*, 384 U.S. at 436, the Supreme Court held that a suspect who is in custody must be advised of his right to remain silent and of his right to the assistance of counsel prior to any interrogation by law enforcement. The Government has the burden to show the knowing and intelligent nature of a *Miranda* waiver. *Id.* at 475. The Supreme Court instructs us to look for two things:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quotation marks and citation omitted).

Here, the agents informed the Defendant of his *Miranda* rights on two occasions, both orally and in writing. First, an FBI agent read him those rights while Defendant was in Gwinnett County custody on May 15. Gov't Ex. 1; Tr. I [45] at 9. Second, the agents repeated those rights on the morning of May 16, after the Defendant indicated his desire to make a statement. Gov't Ex. 2; Tr. I [45] at 21, 24-27. In both cases, in addition to the verbal advisements, the agents provided the

Defendant with a written form that detailed his rights. Gov't Ex. 1-2. Before the interrogation that resulted in statements on May 16, the Defendant executed this form, attesting that he understood each of the enumerated rights, and that he was willing to answer questions without a lawyer present. Gov't Ex. 2.

The Court credits the unrebutted testimony of the agents that they did not threaten the Defendant into signing, that the interrogation was brief, that the Defendant was released from handcuffs, that there were no promises made to induce the statements, that the Defendant was responsive, that he confirmed he could read and understand, that he was educated, and otherwise appeared to understand his rights. Tr. I [45] at 21-28. In these circumstances, the Court finds that the Government proved that it properly provided *Miranda* warnings and that the Defendant voluntarily, knowingly and intelligently waived his rights.

Nor did the agents improperly re-initiate interrogation after the Defendant's initial invocation of his right to remain silent. It is not clear whether the Defendant argues otherwise, although a footnote in his Post-Hearing Brief implies as much. [54] at 8 n.1 ("the agent surely knew that telling Mr. Hector he was charged with using a firearm during a crime of violence [after the Defendant had invoked his right to remain

silent the day before] would certainly cause him to spontaneously retort that he never used a firearm.").

By simply informing the Defendant of the charges being filed against him, the agents were not interrogating him. Informing a suspect of the charges is "normally attendant to arrest and custody" and is therefore excluded from the definition of "interrogation." *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *Enoch v. Gramley*, 70 F.3d 1490, 1500 (7th Cir.1995) ("Briefly reciting to a suspect in custody the basis for holding him, without more, cannot be the functional equivalent of interrogation."); *United States v. Payne*, 954 F.2d 199, 202 (4th Cir.1992) ("the *Innis* definition of interrogation is not so broad as to capture within Miranda's reach all declaratory statements made by police officers concerning the nature of the charges against the suspect and the evidence relating to those charges."); *United States v. Crisco*, 725 F.2d 1228, 1232 (9th Cir.1984) (merely explaining to a suspect why he is being arrested does not constitute interrogation).

The Defendant suggests that it was misleading for the agents to say that he was being charged with using a firearm in furtherance of the robbery because a witness had already identified the Co-Defendant as the one with the gun. [54] at 8 n. 1. Any argument that the agents were trying to trick the Defendant into speaking in violation

14

of *Miranda*–if that in fact is what Defendant is arguing–is meritless. The docket shows that Defendant Hector was in fact charged in a Criminal Complaint on May 16 with using a firearm in connection with the bank robbery. [1]. And a federal grand jury subsequently indicted the Defendant for that same charge. [17]. Thus, the agents' description of the charges being filed against the Defendant that day was accurate, and both a U.S. Magistrate Judge and a federal grand jury found probable cause for the charged crimes.[4] The Court does not find the agents' statements in the car to be a psychological ploy constituting interrogation. There was no *Miranda* violation.

## B.     *Defendant's Statements Were Otherwise Voluntary*

In addition to its compliance with *Miranda*, the Government must also show that the Defendant's statements were made voluntarily. Determining whether a statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational"

---

[4] Regardless of who actually held the gun, the Defendant and his Co-Defendant are jointly charged with committing the crimes and with aiding and abetting each other in doing so. Under Title 18, U.S.C. § 2, which the charging language of both the Complaint and Indictment reference, one who aids and abets the commission of a crime is guilty as a principal.

choice. *Jones*, 32 F.3d at 1516; *see Arizona v. Fulminate*, 499 U.S. 279, 285–88 (1991). The Eleventh Circuit has stated:

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice.

*Jones*, 32 F.3d at 1517 (quotation omitted).

Here, for all the same reasons that the Court finds Defendant's *Miranda* waiver was voluntarily made, the Court finds that his subsequent statements were also voluntarily made. Again, the evidence does not show any coercive conduct, intimidation, physical force or threats, or promises, and the interrogation was very brief. The evidence also shows that the Defendant understood what was happening, was cooperative and responsive, and had at least a high school equivalent education. That he was advised of his right to remain silent on two occasions–both orally and in writing–is also relevant in finding that his statements were voluntarily made. Thus, the Government has proved that the Defendant's statements were obtained in compliance with his Fifth Amendment rights.

## II. NO SUPPRESSION IS WARRANTED FOR ANY PROMPT PRESENTMENT VIOLATION IN THIS CASE

### A.    *The Prompt Presentment Rule*

Even a voluntary confession may be suppressed if given as a result of law enforcement unreasonably and unnecessarily delaying the presentation of the arrestee in court.  This common-law concept is referred to interchangeably as the "prompt presentment rule," and the "*McNabb-Mallory* rule," named after two original Supreme Court cases that recognized this rule and the suppression remedy for its violation. *See McNabb v. United States*, 318 U.S. 332 (1943); *Mallory v. United States*, 354 U.S. 449 (1957).  This rule emanates from common law and the supervisory authority the federal courts possess over the administration of justice, and the Supreme Court has declined to decide whether it has any Constitutional basis.  *See McNabb*, 318 U.S. at 340-341.

Today, the rule and the consequences for its violation are codified in two places. Generally, Fed.R.Crim.P. 5(a) provides that "A person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute

provides otherwise." More specifically, 18 U.S.C. § 3501(c) provides that a post-arrest confession:

> shall not be inadmissible solely because of delay in bringing such person before a magistrate ... (1) if such confession is found by the trial judge to have been made voluntarily and (2) if the weight to be given the confession is left to the jury and (3) if such confession was made or given by such person ***within six hours immediately following his arrest or other detention;*** Provided, That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate judge or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer.

18 U.S.C. § 3501(c) (emphasis added).

In prior cases the Government had taken the position that another subsection of the same statute, 18 U.S.C. § 3501(a), which provides that any confession is generally admissible "if it is voluntarily given," eliminated the prompt presentment rule altogether. The Supreme Court rejected this position in *Corley v. United States*, 556 U.S. 303, 313-314 (2009). In *Corley*, the Supreme Court re-affirmed the *McNabb-Mallory* rule as modified by the six hour safe harbor period provided in 18 U.S.C. § 3501(c). *Id.* The Court's reasoning is summed up in the following phrase:

> Justice Frankfurter's point in *McNabb* is as fresh as ever: 'The history of liberty has largely been the history of observance of procedural

safeguards.' 318 U.S., at 347, 63 S.Ct. 608. *McNabb–Mallory* is one of them, and neither the text nor the history of § 3501 makes out a case that Congress meant to do away with it.

*Corley*, 556 U.S. at 321. As the Court explained, prompt presentment in court is not "just some administrative nicety," but rather "it stretches back to the common law, when it was 'one of the most important' protections 'against unlawful arrest.'" *Id.* at 320 (internal citations omitted). In other words, "[i]n a world without *McNabb–Mallory*, federal agents would be free to question suspects for extended periods before bringing them out in the open, and we have always known what custodial secrecy leads to." *Id.*

Thus, the Court found that "§ 3501 modified *McNabb–Mallory* without supplanting it." *Corley*, 556 U.S. At 322. The Court explained the current state of the prompt presentment rule as follows:

> Under the rule as revised by § 3501(c), a district court with a suppression claim must find whether the defendant confessed within six hours of arrest (unless a longer delay was "reasonable considering the means of transportation and the distance to be traveled to the nearest available [magistrate judge]"). If the confession came within that period, it is admissible, subject to the other Rules of Evidence, so long as it was "made voluntarily and ... the weight to be given [it] is left to the jury." *Ibid.* If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb–Mallory* cases, and if it was, the confession is to be suppressed.

19

*Id.* Several courts have held that the burden of demonstrating an unreasonable delay in presentment rests with the Defendant. *See United States v. Van Poyck*, 77 F.3d 285, 288 (9th Cir. 1996); *Miller v. United States*, 396 F.2d 492, 496 (8th Cir. 1968); *Tillotson v. United States*, 231 F.2d 736, 738 (D.C. Cir. 1956).

**B.**     *The Application Of the Prompt Presentment Rule In This Case*

In this case, the Defendant made his statements approximately 20 hours after he was taken into federal custody. This period is well beyond the six hour safe harbor provided in § 3501(c). The Government does not contend that this delay was necessitated by "the means of transportation and the distance to be traveled to the nearest available" magistrate judge. Rather, the parties principally dispute whether the delay was reasonable or necessary based on other rationale.

"When determining whether a violation of Rule 5 has occurred, courts consider the reasons for the delay, including factors such as the availability of a committing magistrate, the length of the delay before the prisoner is taken before the magistrate, and the police purpose or justification, if any, for the delay." *United States v. Harrold*, 679 F.Supp.2d 1336, 1352-52 (N.D. Ga. 2009) (Thrash, J.). Several courts have recognized, and Defendant does not deny, that "administrative delays due to the

unavailability of government personnel and judges necessary to completing the arraignment process are reasonable and necessary and therefore do not violate the prompt presentment requirement of Rule 5(a)." *Id.* at 1353 (citing *United States v. Garcia-Hernandez*, 569 F.3d 1100, 1106 (9th Cir. 2009)). On the other end of the spectrum, a "delay for the purpose of interrogation is the epitome of 'unnecessary delay.'" *Corley*, 556 U.S. at 308.

The Government argues that the overnight delay in presentment in this case was not due to any bad intent, but rather simply because of administrative reality. In other words, having only arrested the Defendant at 1:30 in Gwinnett County, it was not unreasonable for the agents to assume they could not book him and present him at the U.S. Courthouse in Atlanta by the cut-off of 2:00 p.m., and to instead house him overnight in the detention center. As evidence that the delay was not for the purpose of coercing a confession, the Government points to the fact that the agents picked the Defendant up immediately the following morning to bring him to court, and only began questioning the Defendant once he affirmatively invited it. And even then the agents made sure to re-"Mirandize" the Defendant before any questioning.

Defendant argues that the overnight delay was unreasonable, and he appears to suggest that the agents intended to illegally extend the pre-presentment detention

overnight.  Defendant first states that the agents purposefully "drag[ged] their feet" taking him into their custody, from 1:00 p.m. on May 15, 2012, when the agents arrived, until approximately 1:30 p.m.  [54] at 7-8.  Then, instead of bringing Defendant directly to the U.S. Marshals facility at the U.S. Courthouse, Defendant argues that the FBI agents unreasonably took him to their own facility, which eliminated any chance of presentment that day. [54] at 5.  Defendant argues that this was unreasonable since FBI policy permits booking at other law enforcement facilities, and since the agent's explanation for why they did not consider bringing Defendant directly to the Marshals evoked a concern over inter-agency statistics. *See* Tr. II [47] at 26-27 ("When the Marshals book it doesn't book as an FBI arrest.  We use our facilities to book them and show that they were arrested by our agency.")

In other words, Defendant argues that any administrative barrier to presentment on May 15, 2012 resulted from the agents' own unreasonable choices–whether intentional (as Defendant implies) or not.

The Court finds that the agents' failure to bring the Defendant to Court on May 15, and instead to detain him overnight pending presentment, was not unreasonable. First, as a factual matter, the Court does not find that the agents intentionally or otherwise unreasonably "drag[ged] their feet" from 1:00 p.m. to 1:30 p.m.  The agents

22

had just arrived at this arrest scene and the Court credits the testimony that certain work had to be accomplished to gather information, secure evidence, make determinations as to whether probable cause existed, and the like. Thirty minutes was hardly unreasonable for all of that.[5]

It was also not unreasonable for the agents to book the Defendant at their own facility rather than bring him directly to Court, at least on the facts of this case. Given the short time frame, it is sheer speculation to say that, had they dispensed with booking him, the agents would have been able to deliver the Defendant to the U.S. Marshals in time for court that day. Indeed, by the time the FBI took custody of the

---

[5] Defendant makes much of the fact that one of the agents mentioned, in describing some of the investigative work that was done during this brief period, that they received $200 in apparent robbery proceeds from local officers. Defendant argues that this conflicts with the testimony of the other agent, who indicated that he had already received the money before 1 p.m. [54] at 6-7. According to the Defendant this "conflict" renders the testimony not credible. The Court does not find, as a factual matter, that there was any material conflict or any other reason to question the officers' credibility. The testimony as a whole described a variety of investigative work that was required during this very brief amount of time, of which the receipt of the $200 was only a part. The testimony was also not clear as to the exact timing of the receipt of the $200, as the agents were speaking in "approximate" terms. In any event, even if there were some inconsistency in the testimony as to whether the money was received, say, at 12:55, or 1:10 or even as late as 1:20 is simply not material. The thirty minutes between arriving at the scene and arresting the Defendant was entirely reasonable and the Court credits the officers' explanations as to what was happening during this very brief period.

Defendant, only thirty minutes remained before the deadline, and the agents were still in Gwinnett County, two counties away from the U.S. Courthouse. The evidence showed that the FBI did not even arrive at their own facility in Atlanta until just *after* 2:00 p.m. There is no basis in the record to conclude that they could have made it faster to the U.S. Courthouse.

Moreover, this was a warrantless arrest for a matter being investigated by the FBI, not the U.S. Marshals. The FBI lacked any warrant or Complaint or other paperwork authorizing this arrest. What the Defendant speculates is that the agents could have gotten to the U.S. Courthouse from Gwinnett County before 2:00 p.m., that they could have delivered him to the Marshals without having been booked and without any paperwork authorizing the arrest, and that the FBI could have convinced the Marshals to accept the Defendant and book him as a Marshal's arrest when the Marshals had nothing to do with this case, and that all of this could have been done in time to arrange for a hearing that day. The speculation that this all could have occurred does not form the basis of a *McNabb-Mallory* violation, particularly where it is Defendant's burden to show a violation. Rather, the Court credits the agents' testimony that they brought the Defendant to APD on May 15 because that was

standard procedure, and that they did not delay in doing so. The Court finds on the facts of this case that these actions were reasonable.

A more difficult question is the reasonableness of what happened the next morning. The agents started out in compliance with Rule 5, as they picked the Defendant up at the detention center promptly at 9:30 a.m., and began driving him to the U.S. Courthouse for his initial appearance. The agents also did not begin questioning the Defendant until after he affirmatively invited it. But once he did that, the agents literally turned the car around and brought him, instead of to court, into an interrogation room. Whatever the reasonableness of the overnight detention, the Government produced no evidence or argument establishing why it was necessary or reasonable to delay Defendant's presentment once court opened on the morning of May 16. At that point, any further delay is not explained by unavailability of court staff or administrative deadlines, as court was open and ready to begin receiving arrestees. The Court is of the view that, under Rule 5, the agents should have continued bringing the Defendant to court on the morning of the 16th without the diversion to APD for purposes of interrogating him.

Nevertheless, the Court concludes that the interrogation did not occur during or as a result of this unreasonable and unnecessary delay. The diversion to APD for

the interrogation was very brief. The agents had not even left the detention center parking lot when they diverted to APD instead of to court; it took only approximately five minutes from that point to arrive at the interrogation room; and the entire interview lasted only thirty to forty minutes. Tr. II [47] at 17. There was no evidence suggesting that Defendant's initial appearance before a Magistrate Judge could have possibly occurred during this brief time period. It is beyond belief that the agents could have driven to the Courthouse, that the U.S. Pretrial Services office could have interviewed the Defendant and prepared a bail report for the Magistrate Judge and counsel pursuant to 18 U.S.C. §§ 3152-3154, that an initial appearance would have been scheduled considering the availability of all necessary parties (including defense counsel), all within 45 minutes after the Defendant agreed to talk to the agents.

Indeed, the Defendant was ultimately brought to the U.S. Courthouse at approximately 10:50 a.m., Tr. II [47] at 23, but according to the minute sheet [5] the initial appearance in court did not actually occur for almost two hours. If Defendant had been brought earlier, perhaps the gap in time between arrival at the Courthouse and the hearing might have been shorter. But it obviously the hearing would not have instantaneously occurred upon arrival.

Thus, at least during the brief period of the interview, there was not yet any actual delay in presentment beyond that necessitated by the overnight detention. Defendant was interviewed between approximately 9:45 and 10:30 a.m. This interrogation was almost certainly over before any Rule 5 judicial advisements could have been given, even assuming diligence by the agents. While the agents' questionable decision to divert to APD subsequently delayed Defendant's presentment to some degree–as it presumably would have been scheduled earlier than 1:41 p.m.–that delay did not deny the Defendant any advisement of rights during his actual interrogation.

The cases that have suppressed confessions for being extracted during an unreasonable delay in presentment are distinguishable in this regard. In *McNabb*, for example, the officers arrested the defendants at approximately 2:00 pm on a Thursday and interrogated them on and off for two and half days. *McNabb*, 318 U.S. at 338-338, 344-347. It was not until afterwards that the officers attempted to bring the defendants before a magistrate judge. *Id.* In other words, the defendants in *McNabb* were questioned after they should have been presented to an available Magistrate Judge, and they were denied the benefits of mandatory judicial advisements during

their confessions. Here, by contrast, the questioning was over before any presentment could have been accomplished on the morning of May 16.

On these unique facts–where the interrogation did not occur during an actual delay in presentment other than that necessitated by the reasonable overnight detention–the Defendant does not show prejudice and the Court does not perceive a *McNabb-Mallory* problem. *See United States v. Mullins*, 178 F.3d 334, 342 (5th Cir. 1999) ("[w]here there is no evidence to support a finding that the delay was for the purpose of obtaining a confession, there is no evidence that the delay had a coercive effect on the confession, there is no causal connection between the delay and the confession, and the confession was otherwise voluntarily given . . . the defendant has not shown prejudice by the delay."); *United States v. Gaines*, 555 F.2d 618, 622 (7th Cir. 1977) ("Impliedly, at the very least, we have required a defendant to establish that a delay was deliberately induced for the express purpose of producing evidence.")

## C. *Defendant's Multiple* Miranda *Waivers Vitiated Any Prompt Presentment Violation*

Independently, the Court is compelled to find that any prompt presentment problem was waived by the Defendant.

The Government calls the Court's attention to *U.S. v. O'Neal*, 411 F.2d 131, 136-137 (5th Cir. 1969). In this controlling decision from the former Fifth Circuit, the court rejected a defendant's argument that his confession should be suppressed on the grounds of an alleged *McNabb-Mallory* violation on several independent grounds, one of which was that the Defendant had been properly advised of and agreed to waive his *Miranda* rights before the confession. As *O'Neal* explained:

> *Mallory* was decided before [*Miranda*]. *Mallory* was intended to insure that a suspect not be held for long hours of interrogation during which he had only his own personal stamina with which to resist an overbearing police barrage, and that if he were so intimidated the evidence thus gleaned could not be used at trial. With *Miranda*, however, came the decree that all persons taken into custody must be immediately warned of certain constitutional rights. Appellant was given these warnings. He knew that he was entitled to counsel and that he need not speak to the officers at all. Knowing this, he chose to speak. How, then, can *Mallory* aid him? His detention before seeing the Commissioner, though delayed, caused him no harm.

*Id.*

The Government acknowledges that "*Corley* itself casts doubt on the continued viability of that precedent," [55] at 31, and the undersigned agrees. Indeed, the defendant in *Corley* had also signed a *Miranda* waiver prior to his confession. *Corley*, 556 U.S. at 311. But the impact of the *Miranda* waiver does not appear to have been

presented to the Court in *Corley*, and the majority opinion does not discuss the waiver at all except for in summarizing the facts.

By contrast, the opinion of the four dissenters in *Corley* not only discusses the *Miranda* waiver issue, and cites *O'Neal* , but describes the validity of *O'Neal* and similar cases as an open question even after *Corley*. *Corley*, 556 U.S. at 329 (Alito, J., dissenting). As the dissent opines:

> Of course, arrestees, after receiving *Miranda* warnings, may waive their rights and submit to questioning by law enforcement officers . . . and arrestees may likewise waive the prompt presentment requirement . . . It seems unlikely that arrestees who are willing to waive the right to remain silent and the right to the assistance of counsel during questioning would balk at waiving the right to prompt presentment. More than a few courts of appeals have gone as far as to hold that a waiver of *Miranda* rights also constitutes a waiver under *McNabb–Mallory*. *See, e.g., United States v. Salamanca*, 990 F.2d 629, 634 (C.A.D.C.), *cert. denied*, 510 U.S. 928, 114 S.Ct. 337, 126 L.Ed.2d 281 (1993); *United States v. Barlow*, 693 F.2d 954, 959 (C.A.6 1982), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983); *United States v. Indian Boy X*, 565 F.2d 585, 591 (C.A.9 1977), *cert. denied*, 439 U.S. 841, 99 S.Ct. 131, 58 L.Ed.2d 139 (1978); *United States v. Duvall*, 537 F.2d 15, 23–24, n. 9(CA2), *cert. denied*, 426 U.S. 950, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976); *United States v. Howell*, 470 F.2d 1064, 1067, n. 1 (C.A.9 1972); *Pettyjohn v. United States*, 419 F.2d 651, 656 (C.A.D.C.1969), *cert. denied*, 397 U.S. 1058, 90 S.Ct. 1383, 25 L.Ed.2d 676 (1970); ***O'Neal v. United States, 411 F.2d 131, 136–137(CA5)***, cert. denied, 396 U.S. 827, 90 S.Ct. 72, 24 L.Ed.2d 77 (1969). ***Whether or not those decisions are correct***, it is certainly not clear that the *McNabb-Mallory* rule adds much protection beyond that protected by *Miranda*.

*Id.* at 329-330 (emphasis added).

The issue before this Court is not whether it is sound policy to deem a *Miranda* waiver to vitiate a prompt presentment violation. Rather, the question is whether the Court is free to deviate from prior controlling authority saying that it does. After all, "we are not at liberty to disregard binding case law that is so closely on point and has only been weakened, rather than directly overruled by the Supreme Court." *Florida League of Prof. Lobbyists v. Meggs*, 87 F.3d 457, 462 (11th Cir. 1996).

As a general rule, questions not expressly litigated and considered by the Supreme Court in a case are not considered part of the binding holding of the case. *See, e.g., Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) (reaffirming the longstanding rule that, if a decision does not "squarely addres[s] [an] issue," the Court remains "free to address [it] on the merits" at a later date); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) (an issue not "raised in briefs or argument nor discussed in the opinion of the Court" cannot be taken as "a binding precedent on th[e] point"); *Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not considered as having been so decided as to constitute precedents").

Whether or not *Corley* implicitly overruled cases such as *O'Neal* appears to be a question of first impression in this Circuit. Indeed, few courts appear to have grappled with this question at all. A thoughtful opinion that discusses this very issue is *Brown v. United States*, 979 A.2d 630, 636-637 (D.C. 2009), a decision by the District of Columbia Court of Appeals, which apparently has similar pre-*Corley* precedent as to the impact of a *Miranda* waiver. Citing the *Corley* majority's failure to consider the issue, and the dissenters' view that the issue remained open, *Brown* explained that:

> We therefore do not read *Corley* as effectively overruling our precedents holding that a waiver of *Miranda* rights is waiver of the right to prompt presentment. Rather, the issue is one that merely 'lurk[s] in the . . . record, . . . [not] ruled upon, [and] not considered as having been so decided as to constitute precedent[],' since the 'judicial mind was not asked to focus upon, and the opinion did not address, the point at issue . . . .'

*Id.* (quoting *Threatt v. Winston*, 907 A.2d 780, 790 n. 17 (D.C. 2006)).

The Court agrees with *Brown* that *Corley* did not directly overrule *O'Neal* and similar cases. It appears that the Third Circuit–from which *Corley* emanated–does not have an *O'Neal*-like rule and for that reason, or perhaps another reason, the issue may never have been raised, litigated, preserved and presented to the Supreme Court. In

any event, the clear instruction of *L.A. Tucker* and the other cases cited above is that, because the *Miranda* issue was not discussed, lower courts are not to construe *Corley* as binding precedent on that question. That the four dissenters in *Corley* explicitly described whether or not *O'Neal* was correctly decided as an open question further supports this conclusion. Thus, until it is more clearly abrogated, the Court is compelled to apply *O'Neal*.[6]

Applying *O'Neal*, the Court sees no choice other than to find that Defendant's multiple *Miranda* waivers vitiated any prompt presentment problem. To be sure, the facts of *O'Neal* are not identical. In that case, the defendants were arrested after 10:00 a.m. and made the statements in question before early afternoon, i.e., well within what was later enacted as the six hour safe harbor. *O'Neal*, 411 F.2d at 133. The agents engaged in other various investigative activities during the afternoon that, in combination with the distance to court, apparently resulted in an overnight detention before presentment the next day. *Id.* at 133-134. But the statements at issue were made within the first few hours of arrest, not as a result of the afternoon, evening and overnight delay. *Id.*

---

[6] The Court also notes that Defendant had the opportunity to and chose not to file a reply brief. Thus, Defendant has not supplied the Court with any argument or authority to refute the Government's reliance on *O'Neal*.

But the bottom line of *O'Neal* is that a defendant who is made aware of and willingly waives his rights to remain silent and to consult with an attorney before speaking necessarily suffers no prejudice from a delay in hearing those same rights repeated in court. Indeed, Justice Alito expressly cited *O'Neal* as standing for the proposition that "a waiver of *Miranda* rights also constitutes a waiver under *McNabb–Mallory*." *Corley*, 556 U.S. at 329 (Alito, J., dissenting). This ruling applies equally here. Defendant was provided his *Miranda* warnings on two occasions, and expressly and voluntarily waived his rights immediately before his confession on May 16. Bound as the Court is to apply *O'Neal*, Defendant's motion should be denied on this independent ground.

Accordingly, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Statements [28] be **DENIED**.

## RECOMMENDATION

For the above reasons, **IT IS RECOMMENDED** that the Motion to Suppress Statements [28] be **DENIED**.

**IT IS FURTHER RECOMMENDED** that the Motion to Suppress Evidence [29] be **DENIED** as moot, in light of the Government's representation that it will not use the evidence that is the subject of Defendant's Motion to Suppress.

**IT IS SO RECOMMENDED** this 29th day of January, 2013.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE